Dear Dean Kenderdine
You have asked for our opinion concerning the State Retirement A gency's ("A gency") authority to recover, after an audit, certain payments made by the State to fund retirement contributions for members of the Teachers' Retirement System of Maryland and Teachers' Pension System of Maryland (collectively "the Teachers' Systems"). Your questions relate to State financial assistance to various local educational agencies — boards of education, comm unity colleges, and public libraries — that may be used to fund the salaries and associated costs of their personnel who are members of the Teachers' Systems. Financial assistance is provided to these local educational agencies through a combination of local, State, and federal funding. Because of the potential for duplicative payment for employee fringe benefit costs through the receipt of financial assistance from multiple funding sources, the General Assembly has authorized audits of the local agencies that employ those members and the recovery by the State of any duplicate payments.
You note that, since the Agency assumed responsibility for these audits in 1990, a series of legislative enactments has altered both the scope of the Agency's audit authority and the manner in which financial assistance is determined and allocated by the State to the educational agencies. You ask whether those statutory amendments now operate to eliminate or reduce the potential recovery by the State of duplicate payments.
For the reasons that follow, it is our opinion that, as a result of the statutory amendments, the Agency is precluded from recovering retirement contributions based on the receipt by local boards of education of State or local categorical aid allocated for positions staffed by employees who are members of the Teachers' Systems. In addition, because the State's financial assistance programs for *Page 81 
community colleges and libraries do not allocate funding for retirement contributions, the Agency has little basis on which to make a finding of duplicative payment of retirement contributions for employees of those entities. Of course, the Agency retains authority to audit the local educational agencies and to seek repayment of any overpayment or duplicative payment that may be made for any other reason.
 I Background
A. Audits of State Payment of Retirement Costs for Members of theTeachers' Systems
For many years, the State — and not local governments — has paid the employer's share of retirement costs for members of the Teachers' Systems who are employed by the local school systems, community colleges, and public libraries. Annotated Code of Maryland, State Personnel and Pensions Article ("SPP"), § 21-304(b)(1)(ii)3; Annotated Code of Maryland, Education Article ("ED"), § 5-201(c)(2) (requiring the Comptroller to charge against and pay from the General State School Fund the required annual appropriations for the Teachers' Systems); seealso Chapter 344, § 99, Laws of Maryland 1927.
An overpayment of retirement costs can occur when, among other reaso ns, the State pays the employer's sh are of retirem ent co sts for a particular position through the General State School Fund, but a local education agency — i.e., a local school board, a public library system, or a community college — also receives other payments towards the salary and fringe benefits for that particular position from another source. To ensure that the State was paying only its proper share of the retirement costs for employees of local school systems, the General Assembly first authorized audits of State payments for teacher retirement costs in 1981. Chapter 708, Laws of Maryland 1981. Responsibility for conducting the audits was initially vested in the State Department of Personnel, Division of Social Security, which had already been auditing local education agencies with regard to the State's financial assistance for social security taxes for those employees. *Page 82 
In 1990, the General Assembly transferred audit responsibility to the Agency. Chapter 217, Laws of Maryland 1990. The General Assembly's original grant of audit authority to the Agency also included a review of the State's financial assistance for local social security taxes.
B. Legislative Changes Relating to State Financial Assistance toBoards of Education, Community Colleges, and Public Libraries
Since audit responsibility was transferred to the Agency, however, there have been several legislative enactments that have affected the scope of the audit or the nature of the financial assistance provided to the local educational agencies. Specifically:
 1. Effective July 1, 1992, the formula for computing State financial assistance to community colleges in the State was revised to exclude payments for retirement contributions. Chapter 465, Laws of Maryland 1991, codified at ED § 16-305(c)(9);
 2. Effective July 1, 1993, the State discontinued providing financial assistance for social security taxes to the local boards of education, community colleges, and public libraries. Chapter 1, § 1, 2nd Spec. Sess., Laws of Maryland 1992, amending Former ED §§ 5-202(d), 16-403(b)(9), and 23-403(c) (d); and
 3. Effective June 1, 2002, the General Assembly included as eligible for State payment of retirement contributions those members of the Teachers' Systems who are employed by local boards of education and whose salaries are funded by State or local aid, whether general or categorical in nature. Chapter 288, Laws of Maryland 2002, codified at ED § 5-203(b)(2).
You have asked about the impact of these legislative changes on the Agency's audit responsibilities. *Page 83 
 II Analysis
A. State or Local Categorical Aid to the Boards of Education
The Agency's audit responsibilities with regard to the boards of education are set forth at ED § 5-203, which provides in pertinent part that:
 The Agency may at any time examine the records of the local school systems to determine whether the State's payments for retirement contributions for employees of the school systems are in accordance with the provisions of Division II of the State Personnel and Pensions Article.
ED § 5-203(b)(1). The statute further explains that the Agency shall recover any overpayments:
 [i]f an examination of the records of a local school system shows that the State has paid more than is required under Division II of the State Personnel and Pensions Article . . .
ED § 5-203(c)(1)(i). Pursuant to audit guidelines initially adopted by the Division of Social Security, and later by the Agency, a major aspect of the Agency's audits has concerned a determination of whether the State paid the employer's share of retirement costs for a particular employee through the General State School Fund at the same time that the local board of education also sought and received funding for the same employee via a State or local categorical aid program.[1] If such a duplicative payment had occurred, the Division of Social Security, and later the Agency, noted the overpayment in its audit, and sought reimbursement of the duplicative payment in accordance with ED § 5-203(c) and (d). *Page 84 
In 2002, as part of the Bridge to Excellence in Public Schools Act, popularly known as the "Thornton Bill," the General Assembly added the following provision to the audit statute:
 In making the determination under paragraph (1) of this subsection [i.e., the audit determination as to whether the State's payments for retirement contributions are in accordance with Division II of the State Personnel and Pensions Article], the Agency shall include as employees eligible for State payment of retirement contributions those employees:
 (i) Whose salaries are funded by State or local aid, whether general or categorical in nature; and
 (ii) Who are members of the Teachers' Pension System or Teachers' Retirement System.
Chapter 288, Laws of Maryland 2002, codified at ED § 5-203(b)(2). To understand the intended effect of this provision, it is helpful to consider it in the context of the past audits of local school systems by the Agency and its predecessor, the Division of Social Security.
The Division of Social Security's main responsibility was the collection and payment of local social security taxes to the federal government. The Division also audited the local education agencies for any funding received for local social security taxes.[2] Seegenerally Annotated Code of Maryland, Former Article 73B, §§ 35 through 45 (1988 Repl. Vol.). If, among other things, an audit determined that the local educational agencies had received duplicative funding for these costs from an additional source, the Division of Social Security sought recovery. *Page 85 
The statute that directed the State to pay social security costs for employees of local school systems specified which positions were eligible for the subsidy and directed the then Department of Personnel to adopt regulations defining "eligible positions" for that purpose.See ED § 5-202(d)(1)(ii) (1989 Repl. Vol.). Those regulations limited the category of "eligible positions" to those subsidized by moneys appropriated from the general fund. Former COMAR 06.01.08.01C (1987). Incorporating this approach when it was authorized to audit the State's payment of retirement contributions, the Division of Social Security also developed written guidelines to govern consideration of whether a particular position was "eligible" for State payment of retirement contributions. Consistent with those guidelines, and to prevent duplicative payments, the Division of Social Security (and later the Agency) required local school systems to reimburse the State for payments made by the State for retirement costs and social security taxes when an audit determined that a State or local categorical aid program provided funding for those costs directly to the local school systems.
Beginning with fiscal year 1994, the Legislature discontinued State financial assistance to local educational agencies for social security payments. Chapter 1, § 1, 2nd Spec. Sess., Laws of Maryland 1992. However, the State continued to subsidize retirement costs and the Agency retained the obligation to conduct audits concerning those payments.
In 1999, the General Assembly created the Commission on Education Finance, Equity and Excellence[3] to study and make recommendations concerning the funding of public schools in Maryland. Chapter 601, Laws of Maryland 1999. In the course of its work, the Commission reviewed the State's practice of auditing and obtaining reimbursement of retirement payments. As part of a report that it issued in early 2002, the Commission noted that "under guidelines promulgated by the Maryland State Retirement Agency, local school systems are required to reimburse the State for retirement costs associated with positions funded through federal and most State categorical aid programs. The only State education aid programs to which this requirement does not apply are: (1) basic current expenses; (2) compensatory education; (3) special education; and (4) the Baltimore City/State Partnership." Final Report (January *Page 86 
2002) at p. 79. The report further observed that the General Assembly had directed the reimbursement payments into a special fund providing aid to local school systems:
 For fiscal 2002, it is estimated that school boards will reimburse the State $29.6 million. The amount attributed to State categorical aid programs (as opposed to federal aid programs) is not readily available, but it is estimated that this figure is approximately 20 percent to 29 percent of all school board payments. Until fiscal 2000, all local retirement payments were booked as general fund revenues. Legislation enacted in 2000 required that school board payments be deposited in a new Transitional Education Fund and used to implement the Governor's Teacher Challenge Program. Legislation enacted in 2001 extended the life of the Transitional Education Fund until the end of fiscal 2003 and required that thereafter, school board payments be deposited in the general fund.
Id. Thus, State aid had been paid to local school systems, recovered in part via the audits, and then recycled back to the local school systems by means of another aid program.[4] Noting that it was recommending substantial increases in State aid to local school systems from the general fund, the Commission suggested that it made little sense for the State to seek reimbursement from the local school systems, at least with respect to State aid programs. The report explained:
 In light of the fact that the Commission's proposal for enhancing the State's school finance system includes large increases in funding for several programs, the Commission believes that it is appropriate to consider whether local school boards should be *Page 87 
required to reimburse the State for some or all of the retirement costs associated with State categorical aid programs. After exploring this issue, the Commission concluded that there is no logical reason to distinguish between different types of State education aid programs with regard to payment of retirement costs. Therefore, the Commission recommends that the State pay the retirement costs associated with positions that are funded through any State education aid program. The commission believes that local school systems should continue to reimburse the State for retirement costs associated with positions funded through federal aid programs.
Id. Thus, the Commission recommended that, in determining eligibility for State payment of retirement contributions, the Agency should be required to include, and no longer exclude, those teachers whose salaries are funded by State categorical aid programs.
In response to the Commission's report, the General Assembly enacted the amendment of ED § 5-203(b) excerpted above as part of the Thornton Bill.[5] The fiscal note to the bill explained that the bill required the State to pay the retirement costs of all members of the Teachers' Systems "whose salaries are paid with funding from any state aid program. Under current law, the State does not pay retirement costs for school employees funded through some categorical State aid programs." Fiscal Note to Senate Bill 856 (revised) at p. 5. It further estimated that "[l]ocal school systems would realize a reduction in teachers' retirement expenditures because they would not be required to reimburse the State for retirement payments the State makes on behalf of teachers funded by State categorical aid." Id. at p. 18. The fiscal note estimated that the State's general fund revenues would decrease by $5 million per year annually as a result of this change. Id. at p. 12. Consistent with the fiscal note, the State Department of Education advised local school superintendents, after passage of the bill, that they were no longer required to reimburse the State for payment of retirement costs of personnel subsidized by State categorical grants. Letter of Mary E. *Page 88 
Clapsaddle, Assistant State Superintendent, to Local Superintendents of Schools (June 13, 2003). Thus, it is clear that the addition of ED § 5-203(b)(2) was intended to eliminate reimbursement payments by the local boards relating to those employees who had previously been deemed ineligible for the State subsidy.
In our view, the legislative intent was that, as of the effective date of the 2002 legislation, the Agency may not seek reimbursement amounts from a local school system with respect to retirement contributions for members of the Teachers' Systems based on the school system's receipt of categorical State or local aid. On the other hand, to the extent these positions are funded by federal aid, the boards of education must continue to reimburse the State for retirement costs that may be chargeable to these grants.
B. State Financial Assistance to Community Colleges
The Agency's audit responsibilities with regard to the community colleges are set forth at ED § 16-306. As with the local school systems, the Agency "may at any time examine the records of the public junior and community colleges to determine whether the State's payments for retirement contributions" are in accordance with the statute, and recover any overpayments "[i]f an examination . . . shows that the State has paid more than is required. . . ." ED § 16-306(b) and (c)(1)(i).
Unlike the recent amendments with respect to employees of the local school systems, the General Assembly has not amended the community college law to preclude a finding of duplicative payments of retirement contributions for a member of the Teachers' Systems who is employed by a community college and whose salary is funded by State or local categorical aid. However, it is also clear that the formula for computing State's financial assistance to the community colleges by definition no longer includes payments for retirement contributions or other fringe benefits. The State now distributes funds to the community colleges through the Senator John A. Cade Funding Formula ("Cade Formula"), set forth at ED § 16-305, which establishes a funding formula to calculate the amount of financial assistance to be provided per full-time student. In establishing the Cade Formula, the General Assembly made clear that "[t]he State contribution to retirement and fringe benefit costs is not included in the calculation of amounts under this subsection." Chapter 465, Laws of M aryland 1991, codified at ED § 16-305(c)(9). *Page 89 
The General Assembly has thus made clear that the amounts that are provided to the com munity colleges to cover retirem ent costs under Division II of the SPP are in addition to, and exclusive of, the State's financial assistance to the community colleges under the Cade Formula. As a result, there would be no basis for a finding of a duplicative payment of retirement contributions in assistance provided under the Cade Formula. Thus, there would also be no basis for the State to seek recovery of funds paid under the Cade Formula.
C. State Financial Assistance to Public Libraries
As with local school systems and community colleges, the Agency's audit responsibilities with regard to the State's payment of retirement contributions for members of the Teachers' Systems employed by the public libraries are set forth in statute. ED § 23-504 requires the Agency to "examine the records of the public libraries to determine whether the State's payments for retirement contributions" are in accordance with the law, and recover any overpayments "[i]f an examination . . . shows that the State has paid more than is required. . . ." ED § 23-504(b) and (c)(1)(i).
As with the community colleges, the General Assembly has not amended the law to to preclude a finding of duplicative payments of retirement costs for a member of the Teachers' Systems who is employed by a public library and whose salary is funded by State or local categorical aid. However, there is also no support for a finding that the State's current financial aid program for public libraries includes duplicative payments of retirement costs for employees who are members of the Teachers' Systems.
The State currently provides funding to public libraries based on a formula that requires the State and counties to share in a minimum library program in accordance with ED § 23-503. Under the terms of the statute, the State contributes approximately 40% of the minimum library program, and the participating counties provide through local taxes approximately 60% of the total statewide cost of the minimum library program. ED § 23-503(a). The State's "minimum library program" is based on a per capita amount for each resident of the county, to be used for both operating and capital expenses. ED § 23-503(b). Funds provided through the minimum library program may be used "only for library purposes." ED § 23-506(c)(1). Although funds used "for library purposes" ostensibly could be used to pay fringe benefits of library employees, the General Assembly has already indicated that the State is responsible *Page 90 
for retirement contributions paid under SPP § 21-304(b)(1)(ii)(3). There thus appears to be no basis for attributing either a county's or the State's assistance for the minimum library program to the retirement costs for employees who are members of the Teachers' Systems.
 III Conclusion
In our opinion, the Agency is precluded from recovering retirement contributions based on the receipt by local boards of education of State or local categorical aid allocated for staffing by members of the Teachers' Systems. In addition, because the State's financial assistance programs for community colleges and libraries do not allocate funding for retirement contributions, the Agency has little basis on which to make a finding of duplicative payment of retirement contributions for employees of those entities. Of course, the Agency retains authority to audit the local educational agencies and to seek repayment of any overpayment or duplicative payment that may be made for any other reason.
Douglas F. Gansler
Attorney General
Rachel S. Cohen
Assistant Attorney General
Robert N. McDonald
Chief Counsel
Opinions and Advice
[1] One example of such categorical assistance were annual State grants to the local boards of education to fund pupil transportation services. Those grants included payment for the salaries and fringe benefits of certain eligible members of the Teachers' Systems. See Boardof Education of Prince George's County v. Secretary of Personnel, 317 Md. 34, 36, 562 A.2d 700 (1989).
[2] Prior to 1993, the State paid a portion of the employer social security taxes for teachers and other eligible employees. See Former ED §§ 5-202(d), 16-403(b)(9), 23-403(c) (d) (1989 Repl. Vol.). In 1992, the Legislature passed legislation discontinuing those payments as of July 1, 1993. Chapter 1, § 1, 2nd Spec. Sess., Laws of Maryland 1992.
[3] The Commission has also been frequently referred to as the "Thornton Commission," as it was chaired by Dr. Alvin Thornton of Howard University.
[4] The Governor's Teacher Salary Challenge Program was created in 2000 to provide grants to county school boards to increase teacher salaries. See Chapter 492, Laws of Maryland 2000, codified at ED § 5-213. The Program was repealed in 2004. Chapter 430, § 17, Laws of Maryland 2004.
[5] The Legislature enacted the amendments to ED § 5-203(b) as introduced on behalf of the Commission. See enrolled version of Senate Bill 856 (2002) at p. 23.
 *Page 92